Good morning, may it please the court. Philip McGrady on behalf of the appellant Matthew Anthony. The first issue this court must decide concerns whether officer Lytle unreasonably extended the length of a Terry stop. And I'm just going to cut to the chase and get to the fact that my client Matthew Anthony used his friend's name, Ty Scarta, whose car he was driving when the did use Ty Scarta's name. That's not the issue. It's just one factor the court must consider. The issue is whether Matt Anthony's Fourth Amendment rights were violated. One thing this court knows is that the majority of the suppression hearings that comes before this court involve defendants who either pled guilty after having a suppression motion denied or went to trial and were found guilty. In the words of Thurgood Marshall, I'm quoting here, because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such things apply to the innocent and guilty alike. The point of that, I believe, is that the Constitution will sometimes require that society's interest in being protected, society's interest in punishing crimes will sometimes have to take a back seat to a person's constitutional rights. So Matt Anthony's using Ty Scarta's name is just one factor for the court to consider in determining whether the length of this stop was unreasonably extended. If we accept as true the officer's testimony that he smelled marijuana, if we accept that fact as true, then does your analysis change? It does change somewhat, Your Honor. Why was the stop unreasonably long if the officer, again, I know you dispute this, but the officer smelled marijuana in the car? Well, like you indicated, I do dispute that. First of all, he testified that they were free to leave. Just take that as a given, though, because we understand your dispute of the evidence. But if we accept that as true, then where does that leave you? Taking that as true, if the officer truly smelled burnt marijuana, then he could have held them on the side of the road. I think that changes the analysis. But as I said, I still dispute that because of the testimony that they were free to leave at 321. And had Officer Lytle truly smelled burnt marijuana when he first approached the car at 305, why did he wait for 30 minutes to request a drug dog? He could have easily requested the drug dog when he took Matthew Anthony back to his car, which was at 307 approximately. So he had every opportunity to contact, dispatch and request the drug dog. So smelling burnt marijuana, I think, is undermined. His allegation that he smelled burnt marijuana is undermined by his testimony at the suppression hearing, as well as his conduct on the side of the road there near Miles City. Well, what caused him to call for the drug dog? Apparently it was the discrepancy in the stories. Now, how soon did he get the story from the passenger, which didn't jibe with the story from the driver? Was that after he'd written the warning ticket? It was after he wrote the warning ticket. He wrote the warning ticket at approximately 321. He took Matt Anthony back to a second officer's car a couple minutes after that, went out, got Josh Ritter, brought Josh Ritter back to his car and asked him some questions in the car. And one of the questions he asked him was whether he asked Josh Ritter, will you consent to a search? And Josh Ritter said no. And Officer Lytle's response to that was, well, I have other options. And that's the point when he called dispatch and requested the drug dog after Josh Ritter had refused to consent to a search. And as soon as Officer Lytle asked Josh Ritter if he would consent, he went back to the second car and asked Matt Anthony if he would consent to a search. And Matt Anthony said no. And Officer Lytle later used that against both of them when he called dispatch and said, the problem here, when he was talking to Warren Boots, the problem here is your partners don't want to consent to a search. Now, you all know that invoking your constitutional right to refuse to consent to a search cannot be used as any part of a basis for reasonable suspicion. But all the facts, the totality of the facts here indicate that Officer Lytle did, in fact, use that as part of the reason for requesting the drug dog. When he first called the, for the dog, he didn't say that he'd spilled marijuana, is that correct? That's correct. He did not say that. He just requested the drug dog and that was at roughly 333. And then at 345, after he's questioned all three of them, he then gets back on the phone with dispatch and says, hey, where's the drug dog that I requested? And when you listen to the CD recording, the audio recording, which is part of the case, that he was prompted for that from the dispatch, and maybe a distinction here in Montana, you've got to have a basis for requesting a drug dog. I understand under federal law, Illinois versus Cabalas, I believe, I'm probably butchering the pronunciation of that. But if the drug dog is requested simultaneous with a Terry stop, then there's nothing illegal about that. As long as the drug dog is there simultaneously with the officer investigating the purpose for the stop, then there's no violation of constitutional rights. So the dispatch possibly, I don't know, but possibly said, hey, do you have a reason for requesting the drug dog? And that's the first point that he mentions to dispatch. I smelled marijuana when I first approached the car. He did earlier at around 3.30 approximately, when he went back to Matt Anthony's, who was in Officer Martin's car, the other car, after Matt Anthony refused to consent to the search, he said, hey, well, the reason is, well, I think the way the conversation went was Officer Lytle said, can I have your consent to search the car? And Matt Anthony said, not if you don't have a reason to. And then that's when Officer Lytle says, well, I smelled burnt marijuana when I first approached the car. So he had every opportunity from 3.05 to 3.30 to go ahead and request a drug dog. And I think that's part of the problem here, is that he didn't diligently pursue his own hunches. If he truly had a hunch of smelling burnt marijuana, then he should have pursued that immediately. Perhaps, but does it make the stop unconstitutional? I mean, an officer may want to be careful and not reveal his or her suspicions until later in the search, too. And I think the case law suggests that, I mean, you've got to look at the timing of it. And there are cases, U.S. versus Chamberlain, I believe there was a 20 minute detention and they said it was unconstitutional because the length of the stop. And here the Terry stop ended at 3.21 by Officer Lytle's testimony at the suppression hearing. That's when he issued the warning card and he said they were free to go. So from that point, he never told them they were free to go. They eventually, about an hour and 40 minutes after the stop was initiated, they drove them to Miles City and left them in the parking lot of an Albertson's shopping center. What was the total time of elapsed time from the stop till they took them to Miles City? 3.05 was when the stop was initiated. And I believe 4.46 was at the time they drove them to Miles City. So roughly an hour and 40 minutes from the time that the stop was initiated until the time they left the scene where the stop had occurred. And the second issue that I've raised, well, one other point on the collective knowledge, the government has argued that they're entitled to rely on the collective knowledge of law enforcement, which would mean that Officer Lytle could use information that he learned the day after the stop. And I don't think that's the state of the law. I don't think you get to to build your case through this kind of hindsight analysis afterwards. You're limited to the facts known to you at the time the stop is occurring. When does this collective knowledge come in and what types of cases? The cases that were cited by the government, and I forget the name of the case, but it was an Arizona case. And there was multiple, it was at the border and there were Immigration Customs officials. There was there was an airplane. There was some other officers in cars on the ground. And they were all in communication about what was happening with this guy who was flying a plane. And they overheard some of the radio communication with this guy who was said, no, go, no, go. We got to back out. And ultimately, the court said they could use this collective knowledge known by by the officers who were basically it means all the officers who were pursuing the investigation at the same time here, it should not apply. I mean, following the government's logic would mean that Officer Lytle can go back to the station house. He can detain somebody on the side of the road for 20, 30 minutes, an hour and a half and and search them, perform, have a drug dog come out and do a drug sniff and then go back to the station house and find out facts about them and then incorporate that into the basis for extending the stop. And I don't think that's the state of the law. Thank you, counsel. I know you have the Fifth Amendment issue, but if Ms. Kohler raised that, you can have some time for rebuttal on that. Ms. Kohler. Thank you, Your Honors. Sheila Kohler for the government. This is a very straightforward case. This case, the objective facts support the particular suspicion and the probable cause to hold these defendants. These facts include the smell of marijuana when he first approached the vehicle. Let's for the moment say that you can't consider that. What else do you have? What else do we have? After when he first approached the vehicle, three or two out of the three individuals did not have an ID and he thought that was suspicious. So he asked the driver, which is Mr. Anthony in this case, who are you? And he says his name is Ty Scarta. That is very significant. He did lie about his identification and he continued to lie about who he was. And the reason this was suspicious to the officer is when he was talking to Mr. Anthony and ended up calling in the name Ty Scarta to dispatch, the description came back for Mr. Ty Scarta, a total different description to the individual that's sitting there next to him. At that time, he realizes Scarta, unique name, that this is possibly the intel that he had received the day before the stop from another trooper. That the intel was the vehicle matching this description with the occupants by the name of Scarta were hauling a load of illegal drugs from Washington State to North Dakota. In additional, there were also the conflicting stories about travel that they had been to Billings, Montana. When asked one where his ID was, he said, I lost my wallet in Bozeman, which is two hours west of Billings. So there was conflicting story as to travel also. So we had four things, not considering the smell of marijuana, if you say don't consider that, we have the intel, the line of their names and the line of travel. Is that enough to warrant a drug dog though? If you leave out the marijuana smell, what justifies in all of that calling for a drug dog? Well, to call a drug dog in federal law, Cabela, you have to have the particularized suspicion. And there was enough with, even without the smell of marijuana. But that isn't the case in this situation, Your Honor. In this case, he smelled marijuana as soon as he approached the vehicle. And the federal law does say that the smell of marijuana is probable cause to bring the drug dog. Now, I think there was some odd testimony about Lytle when he said that they were free to go during the suppression hearing at 321. At the failure of my part, I am a state prosecutor and I should have mentioned the state law in Montana, which is the smell of marijuana is not enough to call a drug dog. We suspect that the law enforcement officer being trained in state law, that's what he was thinking when he testified to such. However, we do know that in federal law, the smell of marijuana, cherry and Ramos, is enough to bring a drug dog. And we also know that a Fourth Amendment violation, state law, is irrelevant to a Fourth Amendment violation. Now, this intel communication was that this was the car and it had been carrying drugs or was carrying drugs. Yes. And which had or was or which was carrying illegal drugs. I want to clarify what the defense counsel said that this in intel, cumulative intel or cumulative information. I want to clarify the record that this information did not come after he got to the station house. He had it on his visor. He had it on his visor and he had it prior to the stop, but he didn't make the connection until he heard the name SCARDA. But is the anonymous tip enough? I mean, under our case law, that's that's probably a little icy as well. Is it a reliable known informant? It was not, Your Honor, it was an anonymous tip. However, it proved to be true. I mean, that it was there were drugs in the vehicle. I think the difficulty is, I mean, it comes down to the smell of the marijuana. It doesn't seem like anything else adds up to probable or reasonable cause to detain someone for an hour and 40 minutes. Well, it is the government's position that if you don't have a smell of marijuana, once again, we there we you know, there was credibility found by the district district judge that the officer's testimony was credible and there's greater deference given to such. But we also feel that the lying about their IDs, that obviously the officer knew something was suspicious going on, the intel and the story differences of story of travel and another thing, you know, driver's license when they were asking about when he was sitting there giving the warning card, the defendant, Mr. Anthony, was telling him, well, it may not match my address. It may not be the same. Again, another thing is just this is a competent officer who is thinking there's something going on here. But again, our position is he did smell marijuana. Any further questions? Okay. Thank you, Miss. Thank you. I'll give you a minute for a bottle. I'll just address two things. The when Miss Kolar was talking about the description, when Officer Lytle called dispatch and got the description to find out Ty Scarta, Matt Anthony, he got that before he issued the warning ticket. So he had the opportunity right there to continue asking questions. Instead, he wrote the warning ticket. And it's our position that the Terry stop ended at that point. On the anonymous tip, Judge Siebel did at trial did not let that into evidence. So it is important that this was an uncorroborated anonymous tip. And briefly on the second issue that his Fifth Amendment rights were violated. When the Terry stop ended at 321, from that point forward by Officer Lytle's admission, it ended at 321. By that point forward, he should have been Mirandized prior to any questioning. But the one question that he answered was pretty innocuous and probably was maybe harmless error. And I disagree with that position. It was used on, not that I know of. Do you have any drugs? Not that I know of. Not that I know of. He said, do you have any drugs? Not that I know of. He testified at the suppression hearing that the typical response is no, instead of not that I know of. So, and it was introduced at trial and used against him. And the government has taken the position that only that one statement was introduced and it's harmless error. But first of all, Warren Boots got up and testified against Matt Anthony as a result of the denial of his suppression motion. And it was included in the search warrant. So I think it's a little more than harmless error in the one statement. Thank you, counsel. Case just heard will be submitted for decision. United States. Good morning. My name is Jeremy Yellen and it's my honor to be here representing Raymond Lemire in front of this court. I would like to reserve three minutes if I could for rebuttal. Raymond Lemire is suffering from three substantial errors at trial, separately or together, denied him a fair trial. The first that I've set forth in the brief is the oath issue. I will concede upfront that I did not object when the court failed to give the oath and I didn't know if I missed it, frankly, during the trial. In fact, I had to check with Mr. Carroll during the break and say, did he not give the oath? And of course, Mr. Carroll confirmed it. And then. You seem to be arguing that structural error. I hadn't thought about it in terms of structural error in the state, state of Montana, structural error. I think it may very well be. But in the Supreme Court has not been very generous in extending the concept of structural error. Why, why is the failure to administer a precise oath to a youth approach anything like that? Well, I think that if, if one looks at rule 603, the court does not have to give an oath, but it has to make sure that it gives something that is in a form calculated to awaken the witness's conscience. And I think in reviewing the transcript and frankly, at the time of the trial, I didn't grasp, grasp it, but the court asked this witness to speak out loud. And four times the witness thereafter just nodded affirmatively. The point of that is that the witness didn't even grasp the concept that you have to speak aloud. And then of course, at one point the court said, well, you tell, will you promise to tell the truth or something to that effect? And she said, no. And then the judge said, will you tell the truth? And she said, yes. I think that the point of it is that this, this witness in my humble estimation did not grasp the severity of it. And I think the record of that is, is fairly clear. So I think that whether the objection was made spontaneously or at later point, I still think that given Judge Haddam's reaction to my raising of that issue, negates the plain error analysis in my view. But even if it doesn't, I think that this is such a serious component and necessity of a citizen accused rights that a person have at a minimum, some kind of awakening of their conscience. And that didn't happen here. What exactly did Judge Haddam tell her? Judge Haddam, and if Your Honor, I have it at the exit to the record. I apologize. I realized that perhaps photocopying four in one is hard to read for most. It is for me. Page 140, which is excerpts of the record 141. The judge first asked her, so you speak real clearly. Will you do that for me? And then he asked her to, he says, we're going to ask you some questions. Can you do that? She says, she nods her head. This is, the judge says, I need you to say yes. She again nods her head on page 139. Do you know what it means to tell the truth? The judge, she says, yeah. Do you know what it means to tell a lie? Nods head again, in spite of the fact the judge said you have to answer verbally. You need to say out loud. She says, yeah, all right. And then it goes on to say, when those questions are asked, do you promise us that you'll tell the truth? She says, yeah. And will you, this is, this is interesting. And will you promise us that you will not lie about anything? She says, no. And, and of course, it goes from there. And the interesting thing is in my research, I found that DC Circuit case, Spagnuolo, which talks about the court there said, do you know what happens if you don't tell the truth? And that gets to the crux of it. And the witness in that case, the trial witness in that case said, you get in trouble. So I think that that's a structural error in the state court. I'd be jumping up and down about it. Here, I think it's a deprivation of the Sixth Amendment right to confront the witness under oath. If I can move on to the next component, because it's kind of three plus one, actually. The second component is the FBI gratuitously saying that my client admitted to him that he was, had used marijuana at a previous occasion. Now, of course, to the government's credit, they acknowledged that they did not, they didn't know that was coming. And of course, when the objection was made, motion to strike was not granted. I know Judge Haddon said, well, Judge Haddon at a later point said, just focus on the charge here. He's not charged with any other offense. But the problem is, when you're defending a child molestation case, that's the toughest case to defend. It's harder than a murder case. It's harder than anything. So any little thing is magnified. And so here, marijuana is not the same thing as methamphetamine granted. But the fact that there's an admission of another illegal act is very damaging in my estimation, especially as I go forward. Because in my view, how weak the evidence in this case really was. Now, the third component, the third section that I argue is where Judge Haddon, my client chose to waive his right and testified. And after he testified, Judge Haddon chose to ask some questions. What do you claim? What do you say he said? And of course, we don't have audio like with the Ninth Circuit. You can get tone and demeanor and things of that nature. But it was strong. It was strong. And of course... Well, I read that part, but it doesn't seem to me that that was particularly offensive. Well, in and of it... Tell me again exactly what the context of that is. Well, Mr. Lemire Raymond had said that when he had previously denied the allegations made against him on two other occasions, one right after the allegations surfaced, the next time about a week later with FBI agent Edwards. So he comes in in May of 07 and he meets with Agent Smidala for a while. And Raymond essentially testified that Smidala told him, if you don't confess, you're going to go to prison for life. And he further testified that Agent Smidala would make him look like a serial child molester if he didn't confess. Now, I remind you, Raymond has an eighth grade education, 19 years old, but an eighth grade education. Didn't finish ninth grade. So he gets on the witness stand and talks about this. I asked him, look the jury in the face. Did you do this? No. And of course, Mr. Carroll cross examines him. Then the judge decides he wants to ask questions. What do you claim he said? Something to that effect. What do you say he said? Again, I go back to the point, which is that with these child molestation cases, subtle things matter. And I don't think it was so subtle. The record, you can't tell if it's subtle or not, but it was strong. And then, of course, the question is to the FBI agent, Smidala, did you do this? And of course, this all comes about, and I ask that the court consider this in the context of the quality of evidence in this case. Because I think that's where the rubber meets the road, Your Honors. Because I understand the state thinks and alleges that the evidence was strong. The witness said he did it on the stand, and Raymond confessed at one point. But when you peel back the layers, there are three basic elements that show you that the evidence is very weak. First of all, this supposedly happened in a bed where there were two girls, one on each side of the complainant, in the dark. It supposedly was painful, and yet nobody awoke. And of course, the two other girls testified and said they never heard anything. Raymond said, the confession, that he put a finger an inch and a half inside her vagina for about a minute. Nobody's awoken to that. There's no damage to the hymen, not even a little bit. Of course, Dr. Maynard testified that you can have no damage and still have some penetration. But we know beyond that, that the complainant was in a bicycle accident, because at least she testified to that earlier that day. And another one of the children testified to that, and she hurt herself. And of course, Dr. Maynard also testified that you would expect to see some injury, but not necessarily. Not necessarily. She said that on page 293 of the trial transcript. So we have also this notion of blood. It's not blood. It's suspected blood. The doctor and the nurse on the checklist, the rape kit, they said it was soil. They never checked off the box that was blood. The FBI sends it out presumptively for blood. They can't find a conclusive for blood. Why? Because it's either not blood or there's not enough of it. But we know they didn't test for stool, for feces, and we know Dr. Maynard noted stool in the perianal area. And we noticed, she also noticed that there was staining down the leg and a handprint. And they never tested fingerprints. They never tested to see if it was feces. And that's critical because Dr. Maynard also said that poor hygiene could lead to scratching. And that's what could have irritation, which could have caused whatever little bit of pain or a little bit of blood that there may have been in addition to the stool. The girl, the complainant, said it was poop repeatedly. She later said that he was on top of her. She said she didn't remember what happened. She said his penis was in her. And so, of course, you have, it doesn't fit. His statement doesn't fit. Her statement doesn't fit. But at the end of the day, what you're complaining about are two questions the judge hadn't asked to verify certain, the witness's testimony, right? I mean, that's where, that's where you started this, this discussion. Well, yeah. You're arguing sufficiency now. Well, but, but, but, but when you. I understand your larger point is you think it's a closer case. I think, I think, I'm sorry to cut you off, Your Honor. But I think the point is that when you have those other three errors, plus you have this weak evidence, that's where those other errors, those three errors, even if you don't find in and of itself one of those or two of those does anything. But those errors combined with the weakness of the case clearly shows that, that Raymond's entitled to a new trial. Just about three minutes left, Your Honor, reserve. Yes, thank you very much. Mr. Carroll. Good morning, Your Honors. May it please the court. I'm Vince Carroll for the United States, and I was trial counsel in the district court in this matter. You have to speak up a little. Thank you. Is that better? Yeah. It's the government's position that none of the five issues that Mr. Lemire raises justifies reversing the sentence or the conviction in this matter. Uh, and any error by the trial court in this case was, is clearly harmless. The first, fourth, and fifth issues raised by Mr. Lemire, um, are wholly without merit in the government's position. And I don't intend to address any of those issues unless the court has specific questions on those three particular issues. Um, I think the other two issues, the second and third issue merit some response from the United States and I plan to address those. Regarding the marijuana issue, uh, Judge Fletcher, I, I agree with, uh, with your question or at least the, um, the perception that you have as you read through the record in this case, there wasn't anything, um, kind of a, uh, I'm sorry. I agree that this information should not come, should not have come out. Um, quite frankly, it was an error on my part in preparing the witness for this testimony. But having said that it did get before the jury, so should it have been struck? Looking at it at the time, I don't think even at the time that the... Why shouldn't he have it? Why shouldn't the judge have stricken the testimony? Uh, that I don't understand. Um, I'm not, we can argue about harmlessness or so forth, but why, what's your justification for the judge not striking the testimony? If you look at it at the time it was offered, it arguably had some relevance as far as the defense that was raised, particularly with the defense to the, um, confession. Mr. Yellen's defense or Mr. Lemire's defense in this case was that the defendant was coerced into making this statement, that it was not necessarily voluntary that the statement was made. If you look at it from that, at the time it was made, it was arguably a statement against interest. It had relevance towards the coercion element. Um, but I would agree if you look at it in hindsight, um, after you look at all the evidence that came out in the trial, how it, how it played out. Uh, the defenses that were ultimately raised, the evidence that was presented, I would agree that the, the statement probably should have been struck. I guess I'd understand your response about the coercion element. How was marijuana use, uh, past marijuana use relevant to coercion or whether it was coerced or not? I think it goes to the element of, um, when Mr. Lemire testified that this, uh, that Special Agent Spindola was coercing him into making these statements. He didn't, there was no allegation that, you know, he was coerced into making this statement about the marijuana. It was just a voluntary admission of criminal conduct. And so it, it, it, it could have been argued that, you know, given the fact that he admitted to this marijuana use, shows that he was being voluntary, that he wasn't being coerced. And in addition to that, he admitted to, uh, sexually abusing this child. So that's, I think, how it arguably could have been relevant. It's not the strongest argument, I would concede that. But, uh, at the time the trial judge made the determination not to strike it, I don't know that that was error that, given the circumstances of when it came in. Now looking at it in hindsight, I think it's a little different once you're able to see all the evidence that came out and how the trial progressed. But even assuming it was error, that the trial judge should have struck it, I mean, this is a, you know, the standard is, uh, did the error more likely than not affect the verdict? Um, and I think it's clearly harmless in that it was an isolated reference, in fact it was the only reference to drug use. Um, in a two and a half day trial, the judge ruled on the objection quickly, did not allow the counsel to focus on this statement. Uh, there was no mention of the conduct later in the trial, and it wasn't relied upon by the prosecution during the closing arguments. Uh, there were six other witnesses that testified after this. Uh, so it was basically in the middle of the trial, it was the early, the second day of the trial when this information came out. Um, and I said out in the brief, the evidence, I would disagree with Mr. Yellen's assessment that the evidence was weak in this case. Um, and finally, the trial court instructed the jury that the defendant was not on trial for, that he was only on trial for the conduct charged in the indictment and not for any other activity. So I think looking at this, in the record, the total scheme of things, um, if it was error, it was harmless. It did not, uh, more likely than not affect the verdict. It seems to me that the evidence is very, very weak without the confession. I would agree that the evidence was circumstantial without the confession. Um, but in looking at the, all of the evidence, I mean, there was evidence that this little girl had blood in her underwear. The, the mother testified, maybe, the mother testified that it appeared to be blood. And I would disagree with Mr. Yellen's assessment that there was no test done to, you know, the test showed that this wasn't blood. That's not, and I don't think that's necessarily correct. There was a presumptive, the presumptive test, the initial test that the FBI did as testified to by the agent in the record was that this, this initial test, um, it was tested positive or, or, uh, it was presumptive. Test and that it was blood. And then the confirmatory test was basically, um, you couldn't tell because of either a lack of a sample or lack of sufficient sample, or as the defense council brought out, as Mr. Yellen brought out at the trial, that it wasn't in fact blood. That was the third reason that it didn't, this second test, the confirmatory test, um, wasn't positive, I guess. Um, the consistency of the, of the little girl's statement, Mr. Yellen says that the, that the little girl said that this guy was on top of him, that his penis was in him, all these kinds of things. That's not necessarily, that's not what the little girl said. The little girl's testimony or statements were consistent throughout. Other people like the, the little girl's mother. Didn't she say nothing happened or she couldn't remember when she was taken to the hospital? To one of the nurses. So she wasn't consistent. Absolutely. All the way through this. I don't know that, that the little girl said that nothing happened. Um, it, it, she may have, and I'm just, just not remembering that. Um, but as far as, and again, all the, all this information was presented to the jury, all the sufficiency argument that the, the, that Mr. Yellen makes, he brought all this out in the trial. This was all brought up before the jury. And, um, Mr. Lemire was, was convicted, um, as far as the, and they heard the, the confession. I mean, the confession was, um, put to the jury. When we get to what the judge said, uh. In questioning. Yeah. Lemire was saying that, you know, that this was really coerced. And the tape that was done didn't have any of the preambles. It just starts with, uh. Yes, ma'am. The summary confession, as the agent said. It's a very disturbing thing that they didn't, uh, tape all of it. But the question then is, did the judge really insert himself in a way that cast doubt on what Lemire was saying? No, ma'am. I don't think so. When you look at the record and the questions that were asked in the context of the questioning, I absolutely disagree with Mr. Yellen on this, that he says that the judge was strong. Do you have that part of the transcript there so you can read it to us? Yes, ma'am. Um, I, I'm looking at, um, excerpts of record 214 and the reporter's transcript page 431. After Mr. Lemire testified, um, actually, would you like me to read what the questioning? Yes, ma'am. And if I may just give a little context to this, this was the first time in this whole case when this information came out, we had a suppression hearing before this case started. And there was nothing about Mr. Lemire being coerced or threatened that came out in this, in the suppression hearing. This was the first time that this information came out in the court questioning Mr. Lemire, um, said, well, Mr. Lemire, I have some questions. I want you to tell me what you say. Agent Smetala said he was going to do with the judge that was somehow going to have something to do with your case. And then Mr. Lemire answers the question. And then the court says, so you say that he stated, so you say he stated that he would make you look like a predator in front of me, correct? Yes, sir. And then he would say that you had molested all kinds of children. Yes, sir. And what else do you claim? He said that he would send me away for the rest of my life, that he would do that. Yes, sir. All right. You may step down. You may call your next witness. And then the court says, all right, Mr. Carroll, I want agents produced. And then I respond and the court says, all right, let's get him in here. If anything, from that exchange, it was that the court did not believe agents Medalla or this agent's Medalla had kind of hidden the ball or said something that wasn't accurate to the court. The demeanor of the judge or the questioning there, as you read that, was that the court didn't believe agents Medalla. And then agents Medalla comes in and testifies. And then the judge asked him some questions. I think that goes to the kind of to the heart of this is that this was more of an even handed kind of discussion. The judge was more matter of fact in questioning both witnesses. It's not the protracted interrupting counsel going on and on about this that this court has found offensive or extreme to the point of reversing cases. In fact, one of the cases cited by Mr. Lemire or by Mr. Yellen in his brief, the Williams v. United States, the 1937 case from this court. You look at that case and over a third of the transcript, some 220 of the 600 some odd pages, was the trial court questioning witnesses. And every single question that the trial court asked in that case was designed to help the prosecution. The court was, you know, the court was sarcastic, questioning the defendants on and on and on, this kind of thing. And we don't have that in this case. This is the trial judge simply asking questions or framing questions, framing the issue for the jury. Well, what was the issue that the judge was framing for the jury? I think, Noel, you know, as you said, there was no issue of coercion at least to this point. So, I mean, there's there's one there's there's no judges can ask clarifying questions, but I'm not sure I understand what what judge was after here, nor do I understand particularly why he would say, I want this agent called to testify in that. I think that I think Judge Haddon was was framing that issue for the jury. You have a testimony from the defendant that one thing was said. And then Judge Haddon, I think, was getting at what did the agent what is the agent going to. Well, there are two possibilities, and they're both plausible. One is, as you said, that he was concerned about the agent's testimony, wanted him there. The second one was that he was going to make sure that the testimony was rebutted. And, Your Honor, as I said in my response to Judge Haddon, it was obvious that when this information came out that I was going to call Special Agent Smadala to come in and rebut that to to do. But he apparently felt the need to encourage you to do that. Yes, Your Honor. I often need encouraging, I guess. I want the witness produced. Yes, Your Honor. You know, another disturbing part about this, I've listened to the transcript of the questioning of LaMere. Yes, ma'am. And they were almost feeding him the answer and asking him to agree with it. Now, it's not a normal type of confession. I'm sure you've listened to it, too. Yes. Yes, Your Honor, I have. It's a very disturbing part of the case. They don't have any of the they don't record anything until they go to the questioning. Yes, ma'am. Yes, Your Honor. And another thing in Judge Haddon's court is that the word polygraph is never to be mentioned. And that's kind of the thousand pound gorilla that everybody's dancing around. Well, not only in Judge Haddon's court. I'm sorry? Not only in Judge Haddon's court. And it has a basis in the law and not necessarily I'm not disagreeing with Judge Haddon on this. But this is the issue, I think, that was kind of in the forefront of everyone's mind, particularly Agent Smadala, because he testifies often in Judge Haddon's courtroom and he's a polygrapher for the FBI. And so that's kind of the issue everybody's dancing around. It doesn't get mentioned. Even arguably, if the defendant brings opens the door to the information, it's not allowed to be brought up. And so that's that's kind of the I guess the context in some of these recordings is that they're careful not to mention the word polygraph has taken place. But what happens in most circumstances, I suspect, is you have an informal interview and a polygraph and then the tape goes on in the confessional interview, right? That's the secret. Yes, Your Honor. That's that's how these these take place. And if there are no more. Any further questions? Thank you, Your Honor. Raymond Lemire is in jail for 30 years, and the point why I make that point is because the trial's got to be fair if you're going to send somebody to jail for a mandatory minimum of 30 years. And here, the notion that somehow, in hindsight, the marijuana discussion was inappropriate, but at the time it may have been a suggestion that Raymond was under the influence of marijuana by anybody at any time when he made this so-called confession. The marijuana should never have been introduced. It was gratuitously placed by the FBI agent because he's experienced. With relation to this, the oath, and I guess, Mr. Carroll, let me back up. Mr. Carroll brought out the fact the jury heard all the inconsistencies. But they also heard the court saying to Mr. Lemire, what do you claim he said? What do you say he said? And then, of course, when Smidala got up there, he said, did you? Did you say this? The jury heard that. They heard the inconsistencies, but they also heard that. The jury also heard the marijuana. They didn't need to hear that marijuana. With relation to this, the complainant was consistent. She claimed it was poop. She claimed it was poop until her parents didn't believe her. The father had been drinking. They were upset because she was nowhere to be found. She shouldn't have been over there. Her clothes are dirty and it's a ruckus. She says it's poop. She repeatedly says it. And then, of course, it's not. Mother suspects it's blood. The doctor doesn't note it's blood. I want to bring out another point. The state, the government's DNA expert, their forensic scientist, they're the one who said we didn't conclusively find it was blood because it may not have been blood to begin with. And I agree with Your Honor Fletcher that the case was weak, even with the confession, because Raymond had repeatedly denied. And we had this four-minute and 20-second statement. And Your Honor, I appreciate on behalf of Raymond. And when I told Judge Haddard's sentencing, Raymond's lost. He's lost. 30 years on this record is not justice. Thank you. Thank you, counsel. The case has certainly been submitted. It's a, let's say, quite a personal privilege. It's nice to see a bunch of attorneys arguing here today. So thank all of you for appearing. Nice to see the whole town, folks. We'll be in recess. Good morning. All rise.
judges: Fletcher B. , Tashima, Thomas